**Brent REEDSTROM, Plaintiff,**

v.

**NOVA CHEMICALS, INC., Defendant.**

No. C–3–99–642.

United States District Court,
S.D. Ohio,
Western Division.

Nov. 19, 2002.

Donald Francis Brezine, Carretta, Cornish & Brezine Co., L.P.A., Fairborn, OH, for plaintiff.

Linda Hauserman Harrold, Belkin Billick & Harrold Co LPA, Cleveland, OH, Lester William Armstrong, Belkin Billick & Harrold Co LPA, Cleveland, OH, for defendant.

DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION FOR REMAND (DOC. # 21) AND HIS RENEWED MOTION FOR REMAND (DOC. # 25); PLAINTIFF'S MOTION FOR DETERMINATION (DOC. # 20) SUSTAINED; COURT MAKES THE FOLLOWING CONCLUSIONS: (1) THE SEVERANCE POLICY IS A COMPONENT OF THE EMPLOYMENT TRANSITION AND CONTINUITY ("ET & C") PROGRAM; (2) THE ET & C PROGRAM IS AN "EMPLOYEE WELFARE BENEFIT PLAN," WITHIN THE MEANING OF ERISA; (3) THE COURT WILL EMPLOY A *DE NOVO* STANDARD OF REVIEW, DUE TO DEFENDANT'S FAILURE TO PROVIDE SUFFICIENT WRITTEN NOTICE OF ITS DENIAL OF PLAINTIFF'S CLAIM, IN VIOLATION OF § 1133, AND ITS FAILURE TO PROVIDE ITS INTERPRETATION OF THE PLAN DOCUMENTS THEREIN; (4) THE COURT MAY CONSIDER THE PLAN DOCUMENTS, AS WELL AS DOCUMENTS GIVING BACKGROUND INFORMATION, OF WHICH ALL RELEVANT NOVA EMPLOYEES HAD NOTICE; AND (5) APPLYING THE *DE NOVO* STANDARD OF REVIEW, DEFENDANT DID NOT IMPROPERLY DENY PLAINTIFF SEVERANCE BENEFITS; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANT AND AGAINST THE PLAINTIFF; TERMINATION ENTRY

RICE, Chief Judge.

This litigation arises from Plaintiff Brent Reedstrom's failure to receive sever-

ance benefits upon his resignation from his employment with Defendant NOVA Chemicals ("NOVA"). Plaintiff was an employee of NOVA from March of 1987 until October 4, 1996. Throughout 1996, NOVA underwent a two-stage reorganization. Phase 1, which was effectuated on April 15, 1996, altered the leadership structure of the Styrenics Technology Group, of which Plaintiff was a part. Phase 2 was "a longer-term major restructuring involving the entire Styrenics business and other parts of [NOVA]." (McLeod Decl. ¶ 4). With the implementation of Phase 1, two leadership positions were eliminated in the Technology Group, and the individuals who formerly held those positions were reassigned to "Special Projects" within the Group. Reedstrom lost his leadership position as a result of Phase 1 of the reorganization.

In his Complaint, Reedstrom alleges that on April 15, 1996, his employer substantially changed and/or eliminated his position, rendering him eligible for the Employment Transition and Continuity Program ("ET & C Program"). In May, 1996, NOVA issued a directive that employees would not be eligible for severance or other benefits under the ET & C Program unless they remained with NOVA through December 31, 1996. Plaintiff asserts that the May, 1996, memorandum was inapplicable to him, because he had previously been made eligible for ET & C Program benefits, without restriction, in April of 1996. Plaintiff resigned prior to the end of 1996, and was denied severance and other ET & C benefits.

Consequently, Reedstrom brought suit against NOVA in the Miami County Court of Common Pleas, alleging breach of contract. On December 9, 1999, Defendant removed the action to this Court, on the ground that the ET & C Program constitutes an employee welfare benefit plan, within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq.

On October 13, 2000, Defendant filed a Motion for Summary Judgment, asserting that the ET & C Program constitutes an ERISA plan, and that the plan administrator's determination that Plaintiff was ineligible for benefits was not arbitrary and capricious (Doc. # 12). The Court overruled the Motion on two bases (Doc. # 16). *First*, the Court indicated that it was not clear whether the ET & C Program qualifies as an "employee welfare benefit plan." In particular, due to the ET & C Guideline's reference to "the Company's Severance Plan," it was unclear whether the true ERISA plan is the ET & C Guidelines or the Severance Plan itself. Because the Court had not been provided a copy of the Severance Plan, it could not resolve the issue. *Second*, the Court noted a separate and more fundamental ground for overruling Defendant's motion, to wit: that summary judgment is inapposite to determinations of whether a denial of ERISA plan benefits is arbitrary and capricious. In *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir.1998), the Sixth Circuit held that "a district court should not adjudicate an ERISA action as if it were conducting a standard bench trial." Rather, it must be decided based solely upon evidentiary materials that were before the plan administrator. *Id.* at 619. Accordingly, assuming that the ET & C Guidelines constituted the relevant ERISA plan, Defendant's summary judgment motion was not procedurally proper. However, the Court further noted that it was unable to determine which evidence was before NOVA's plan administrator when it rejected Reedstrom's request for benefits.

Consequently, the Court directed Defendant to file a supplemental memorandum, addressing two issues: (1)(a) the relation-

ship between NOVA's ET & C Program and its Severance Plan, and (b) whether either or both constitutes an "employee welfare benefit plan," within the meaning of ERISA, and (2) the identity of the evidence which was before the plan administrator when it decided not to give Reedstrom severance pay or other benefits under the ET & C Program. Plaintiff was given the opportunity to file a responsive memorandum, and Defendant was granted leave to file a reply memorandum. Both parties have briefed the issues, and they are ripe for determination. As a means of analysis, the Court will address the three issues in the order stated above. Upon review of the parties' submissions, the Court concludes NOVA's ET & C Program constitutes an ERISA plan.[1] The Court further concludes that the plan administrator's denial of severance payments under the ET & C Program was proper.

## A. *Relationship Between the ET & C Program and the Severance Plan*

In removing this litigation to federal court, Defendant has asserted that its ET & C Program constitutes an "employee welfare benefit plan", within the meaning of ERISA. The details of the ET & C Program are set forth in a manual, entitled "Employment Transition & Continuity Guidelines" ("the Guidelines"). (Wensky Decl. at Ex. A). According to that manual, NOVA's ET & C Program "is designed to accomplish necessary workforce reductions by offering people an opportunity to make choices about their future and supporting their choices with meaningful career transition programs." (*Id.* at 5). In large part, the manual describes various career assistance programs that may be available to individuals who voluntarily or involuntarily separate from NOVA as part of a workforce reduction. Available options include retirement, education assistance, community support, unrestricted leave of absence, entrepreneurial venture assistance, skills upgrading, relocation assistance, and benefits continuation. In some cases, displaced workers also are entitled to receive severance payments as part of the ET & C Program.

In this Court's prior Decision (Doc. # 16), it noted that the availability of severance pay is governed, at least in part, by a separate document. Portions of the Guidelines specifically reference "the Company's Severance Plan," and the manual further informs employees "that to the extent this manual describes a benefit or program involving a NOVA benefit plan, your entitlements under that plan will be governed by the terms, conditions, and limitations of that particular plan as evidenced by the legal plan document." (Wensky Decl. Ex. A at 1). Because the Court must consider only the administrative record when reviewing a denial of ERISA benefits, it is essential for the Court to identify the relevant plan documents. Thus, in order to analyze Plaintiff's claim, it is critically important to determine whether Plaintiff's circumstances were governed by the ET & C Program or a separate severance plan.

■ In its supplemental memoranda (Doc. # 17, Doc. # 19), NOVA indicates that the document referred to as "the Company's Severance Plan" or "the Novacor Severance Plan" is a chart which contains the formula for calculating an em-

---

**1.** Because Plaintiff's claim falls within § 1132(a)(1)(B) of ERISA, as discussed, *infra*, this Court has federal question subject matter jurisdiction over this action. This litigation, therefore, will proceed in this Court, and it will not be remanded to state court. Plaintiff's Motion for Remand (Doc. # 21) and his Renewed Motion for Remand (Doc. # 25) are OVERRULED.

ployee's weeks of severance, based on the employee's years of service and salary (Hay Points), with an age-based bonus. According to Mr. Arnold Wensky, since 1994, receipt of severance pay under the Severance Plan has always been linked to a workforce reduction, which has activated the ET & C Program (Wensky Supp. Decl. ¶ 3). He states:

> Severance pay is not paid independently of the ET & C Program or even absent the employee's eligibility for the ET & C Program. Only after a business unit leader has established a workforce reduction target and activated the voluntary separation window of the ET & C Program does anyone become eligible for severance. Even then, eligibility for severance is determined by the terms of the ET & C Program, while the amount of severance pay is dictated by the Severance Plan.

*Id.* Thus, Mr. Wensky indicates that the Severance Plan is merely the formula for calculating an employee's severance amount, and it is not a plan separate and apart from the ET & C Program.

Plaintiff contends that NOVA's communications with employees indicate that severance payments were not exclusively a component of the ET & C Program. *First,* Plaintiff cites to Defendant's Exhibit L, the Estimated Severance and Benefit Fact Sheet that it created for Plaintiff (Doc. # 12, Ex. L), and to Defendant's Leaders Guide for Explaining Fact Sheets (Doc. # 12, Ex. M). Plaintiff argues that both documents contain terms included in the ET & C Program, such as "redundancy," yet there are no references to the ET & C Program. *Second,* Plaintiff asserts that NOVA has not claimed that none of its employees received a severance payment outside of the ET & C Program. *Third,* Plaintiff takes issue with the fact that the Severance Chart provided by

NOVA contains no "terms," which the Guidelines suggest exist. *Fourth,* Plaintiff argues that Mr. Wensky's statement that severance pay is exclusively a component of the ET & C Program is belied by the language of Keith McLeod's memorandum of April 3, 1996, which states: "In addition to the severance payment and extension of some benefits coverage, the ET & C program would also generally be available in such circumstances." (Doc. # 13, Ex. 3).

Plaintiff's evidence does not refute Mr. Wensky's statements that the Severance Plan is merely the formula for calculating severance payments, and that it is not a plan separate from the ET & C Program. The Estimated Severance Benefit Sheet addresses only the *amount* of severance payments to which Reedstrom might be entitled, should he comply with certain requirements; the fact that neither the Guidelines nor the ET & C Program is mentioned is not troublesome, considering that the Estimated Severance Benefit Sheet focuses only on the formula for calculating the severance amount. Although the Guide for Explaining the Fact Sheet also does not reference the Guidelines or the ET & C Program, the Court cannot conclude from the lack of a reference alone that the Severance Plan and the ET & C Program are unrelated. Moreover, the fact that the Severance Plan constitutes a formula chart and does not contain additional "terms" does not indicate that another severance plan exists or that severance pay is provided separately from ET & C benefits.

Plaintiff's argument that "Defendant makes absolutely no claim that none of its employees terminat[ed] [between 1994 and April 15, 1996] received severance pay other than through the ET & C" is not persuasive. Although NOVA has not used those precise words, it has made that assertion. In particular, Mr. Wensky has

specifically stated that, since 1994, "[s]everance pay is not paid independently of the ET & C Program." (Wensky Supp. Decl. ¶ 3).

Plaintiff further argues that Defendant has repeatedly referred to severance pay as separate from ET & C Program benefits. As noted by Plaintiff, Keith McLeod wrote in an April 3, 1996, memorandum:

I've followed up with HR and there is no difficulty in your contacting Scott Loomer to determine what your severance eligibility would be in the event that your employment at Novacor ended through no fault of your own. This would also apply in situations where your position was substantially changed ("substantially" needs to be defined, but could include a significant change in working conditions such as a job being changed from a day job to a shift job, a significant change in work location (moving from Xroads to LTC is NOT considered significant!!), a significant reduction in Hay pts, etc). *In addition to the severance payment and extension of some benefits coverage, the ET & C package would also generally be available in such circumstances.* In some of the ET & C options there are some specific requirements (such as 5 years of service to be eligible for education option), etc. Some of the ET & C options might also specifically be in place of severance, and hence severance would not apply.

(Doc. # 13, Ex. 3)(emphasis added). Mr. McLeod's language thus suggests that ET & C options do not include severance, and that severance is available through another program. The September 19, 1996, correspondence from Defendant to Reedstrom (which was never sent) also refers to severance and ET & C separately, stating: "Your eligibility for severance and the ET & C program are contingent upon you[r]

continuing active employment with NOVA Chemicals Inc. through 12/31/96." (*Id.,* Ex. 5). The Declaration of Paul Boulier, currently the Vice President of Corporate Development, also repeatedly discusses the ET & C Program *and* severance, implying they are related but not the same. (Boulier Decl. ¶¶ 3, 5, 7, 9, 10).

Despite the ambiguous manner in which the above employees refer to severance, each of these individuals specifically state that Plaintiff was not entitled to receive severance payments, because the ET & C program had not been triggered. In his declaration, Mr. McLeod indicates that he had no intention of opening any ET & C windows, either during or as a result of Phase 1 of the reorganization (McLeod Decl. ¶ 7), and that he never suggested that any Technology employee would be terminated or would be leaving under ET & C as a result of Phase 1 (*id.* ¶ 9). Mr. Boulier stated that the changes resulting from Phase 1 did not warrant opening the ET & C Program or trigger severance eligibility, that no business unit had been targeted for workforce reduction, and he saw no basis to do so (Boulier Decl. ¶ 3). As stated, *supra,* Mr. Wensky has stated that severance is not given apart from the ET & C Program.

Moreover, the Guidelines recognize that severance is provided under the ET & C Program. For example, page 10 of the Guidelines discusses when proposals are required under the ET & C Program. It provides, in pertinent part:

You won't need to submit a proposal if you simply want to resign from NOVA or take part in the standard retirement plan. If you are leaving as a result of targeted reductions in your business unit under the ET & C process, you are entitled to severance under the terms of the Novacor Severance Plan applicable to your business unit.

(Guidelines at 10). The Choosing Selective Voluntary Separation section of the Guidelines references a severance option, stating: "Employees who elect to move on have a choice. You can accept an immediate severance package and/or put in a proposal for one of the following selective voluntary separation options: . . . ." (*id.* at 35). Numerous sample form letters in the Guidelines further state: "We hereby confirm that you are eligible for the Severance portion of the ET & C Program." (*E.g., id.* at 66). Thus, the Guidelines themselves indicate that severance is provided under the ET & C Program. Significantly, Plaintiff has not provided any evidence, documentary or otherwise, that any employee has received severance payments, except as permitted under the ET & C Program. In fact, Plaintiff himself stated that severance is part of the ET & C Program (Reedstrom Depo. at 80).

Accordingly, upon review of the evidence, the Court concludes that Plaintiff has failed to refute Defendant's evidence that the Severance Plan is administered as part of the ET & C Program, and requires eligibility for ET & C Program benefits. In other words, the Court concludes that the Severance Plan is a component of the ET & C Program.

### B. *Whether the ET & C Program Constitutes an Employee Welfare Benefit Plan*

▉ The Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq., is the comprehensive federal law governing employee benefits. *Agrawal v. Paul Revere Life Ins. Co.,* 205 F.3d 297, 299 (6th Cir.2000). An "employee welfare benefit plan" is defined as

> any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title. . . .

29 U.S.C. § 1002(1). In *Thompson v. American Home Assurance Co.,* 95 F.3d 429, 434 (6th Cir.1996), the Sixth Circuit set forth a three-step factual analysis in order to determine whether a benefit plan satisfies the statutory definition of an employee welfare benefit plan. *First,* the district court should apply the Department of Labor "safe harbor" regulations to determine whether the program is exempt from ERISA. *Id.* at 434. *Second,* the court should determine if a "plan" existed by inquiring whether, "from the surrounding circumstances[,] a reasonable person [could] ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id.* at 435 (quoting *International Resources, Inc. v. New York Life Ins. Co.,* 950 F.2d 294, 297 (6th Cir.1991)). *Third,* the court should evaluate whether the employer established or maintained the plan with the intent of providing benefits to its employees. *Id.* It is well-settled that a plan providing for severance pay may qualify as an "employee welfare benefit plan." *Shahid v. Ford Motor Co.,* 76 F.3d 1404, 1409–10 (6th Cir.1996).

▉ Beginning with the first *Thompson* prong, the safe harbor regulations exclude an employer-provided insurance plan from ERISA coverage if, and only if, the following four criteria are satisfied: (1) the employer makes no financial contribution to policy premiums; (2) employee participation is voluntary; (3) the employer's

sole function is to permit the insurer to publicize the policy to employees and to collect payroll deductions, *i.e.*, not to endorse the policy; and (4) the employer receives no consideration from the insurer. *Thompson,* 95 F.3d at 435; *see also* 29 C.F.R. § 2510.3–1(j). Herein, it is clear from the evidence submitted that the safe harbor provision is inapplicable, because the ET & C Program is funded through general company funds and is administered by NOVA. In addition, it is evident that the ET & C Program satisfies the third *Thompson* prong, since it was established to provide benefits for NOVA's employees. Thus, the Court will focus on the second prong of the *Thompson* analysis.

The evidence submitted by the parties indicates that a reasonable person could ascertain the intended benefits of the ET & C Program, including the Severance Plan. The Guidelines contain detailed information about the options under the Program, including alternative work arrangements, such as job sharing, part-time employment, a reduced work week, or a seasonal work arrangement; retirement; unrestricted leave of absence; community support, such as outplacement counseling; skills upgrading; relocation assistance; educational assistance; and entrepreneurial venture assistance; and severance. The Guidelines incorporate by reference the formula for calculating severance payments. Thus, the intended benefits are clearly identifiable.

The class of beneficiaries is indicated in the Directions section of the Guidelines under ET & C Eligibility. It states:

You are eligible to participate in the process if you are a regular, non-union NOVA employee in US, and offshore locations (full-time or part-time) and you belong to a business unit targeted for reductions. If you are a temporary employee who has been on the company's payroll for more than two years you are also eligible.

(Wensky Aff. Ex. A at 8). The Guidelines further indicate that NOVA determines which business units are eligible and any specific limitations or modifications to the ET & C Program that are applicable to that business unit (*id.*). Based on these statements, a reasonable person should be able to determine which employees are eligible for ET & C Program at a particular time.

The Guidelines do not indicate the source of financing for the ET & C Program. However, there is no indication that employees are required to contribute funds to support it. In addition, Mr. Wensky indicates that the Program is financed through general company funds (Wensky Supp. Decl. ¶ 12).

The procedures for receiving benefits under the ET & C program, including severance, are also set forth in the Guidelines. As indicated by Mr. Wensky, the guidelines provides a succession of options as the workforce reduction evolves. First, the leader of a group undergoing restructuring must identify which business units are facing reductions (Guidelines at 11). Initially, the business unit will try to achieve the required reductions through alternative work arrangements (*id.* at 11, 17–31). If the unit has not achieved the necessary reductions through this option, the leader will meet with affected employees and confirm the window of time for electing voluntary separation (*id.* at 11). At this time, the leader will discuss with employees the details of their severance eligibility (*id.*). If an employee chooses to separate voluntarily, he or she may also be eligible to elect one of the ET & C Program options, such as the education option, community support, skills upgrading, entrepreneurial ventures, or relocation. The Guidelines indicate that employees must

submit a proposal in order to apply for these options, and it includes sample completed forms (*id.* at 10, 34–73). It further sets forth the procedures for eligibility appeals, for reviewing an employee's proposal, and for finalizing a proposal through a letter of understanding (*id.* at 9–10). In the event that reductions are not met through alternative work arrangements and voluntary separation, they may be made through involuntary separations. Employees will then enter a three-month redundancy period, during which they may search for a new job within NOVA or leave its employ. Employees may choose the options which were available to those who voluntarily separated, using the same procedures. In light of the foregoing, the Court concludes that the procedures for obtaining benefits is readily ascertainable by a reasonable person.

Accordingly, the Court concludes that a reasonable person could ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits of the ET & C Program, including the severance option. Thus, the ET & C Program qualifies as an employee welfare benefit plan, with the meaning of ERISA.

### C. *Evidence Before the Plan Administrator*

■ As noted in this Court's prior Decision (Doc. # 16), the Sixth Circuit has held that "a district court should not adjudicate an ERISA action as is if it were conducting a standard bench trial." *Wilkins,* 150 F.3d at 618. The Sixth Circuit further held that in reviewing the administrator's decision to deny benefits, a district court should limit its review to the evidence contained in the administrative record. It may not consider "any depositions, affidavits, or similar litigation-related materials." *University Hosps. of Cleveland v.* *Emerson Elec. Co.,* 202 F.3d 839, 845 n. 2 (6th Cir.2000). However, additional evidence may be considered where there is a procedural challenge to the administrator's decision, such as lack of due process afforded by the administrator or alleged bias on its part. *Wilkins,* 150 F.3d at 618. In light of this standard, the Court ordered NOVA to identify what evidence was before the plan administrator when it decided not to give Reedstrom severance pay or other benefits under the ET & C Program (Doc. # 16).

In its Supplemental Memorandum (Doc. # 17), NOVA identified three individuals who reviewed Plaintiff's situation and determined he was not eligible for ET & C benefits, including severance, to wit: Keith McLeod and Paul Boulier (Plaintiff's leaders), and Arnold Wensky (Senior People Consultant). As Styrenics Product Development & Technology Leader through Phase 1 of the reorganization, Mr. McLeod made the determination that there was no reason to activate the ET & C Program for anyone. Mr. Boulier replaced Mr. McLeod as Plaintiff's leader in mid-April of 1996. Mr. Boulier indicated that he first became aware that Reedstrom considered himself eligible for ET & C Program benefits, including severance, when he submitted his resignation notice. Mr. Boulier advised Plaintiff at that time that he was ineligible for benefits. In his Declaration, Mr. Wensky states that he received a memorandum from Plaintiff, dated September 26, 1996, in which Reedstrom set forth his reasoning for believing that he was eligible for ET & C Program benefits, including severance. Mr. Wensky responded that he had not met the criteria for ET & C benefits and severance, because he was leaving his employment prior to December 31, 1996.

■ To satisfy the Court's request for identification of the administrative record,

NOVA has presented numerous items for each individual involved in the decision to deny severance. Each individual identified the Guidelines as evidence which was considered. However, as noted by Plaintiff, the vast majority of the information which was identified are "expressions of the minds of the people themselves." (Doc. # 18 at 4). Many of these bulleted items begin with "his knowledge of," "his familiarity with," or "the fact that." (Doc. # 17 at 10–14).

Based on Defendant's response to the Court's request for identification of the administrative record, it is clear that no administrative records exists, as it is usually thought of. Unlike the administrative record for a claim for disability benefits, which would usually involve a claim form, medical records, and supporting affidavits from relevant experts, this case appears to lack a claim form (other than Plaintiff's September 26, 1996, correspondence to Mr. Wensky) and supporting evidence from Plaintiff. Upon review of the evidence before the Court, the Court has found no written denial of benefits, setting forth the rationale for NOVA's denial of severance payments. Although Mr. Wensky indicates in his original Declaration that he corresponded with Plaintiff regarding the ET & C Program and severance criteria in 1998 (Wensky Decl. ¶ 21), there is no indication he or any other NOVA employee issued a denial of benefits letter. In fact, Mr. Scott Loomer indicated that he informed Plaintiff that "NOVA did not give letters stating that someone was not eligible for ET & C; that he would receive a letter from his leader only if he was considered eligible for ET & C; and that if he did not receive such a letter he was not eligible for ET & C or severance." (Loomer Decl. ¶ 4). Accordingly, the Court is hard-pressed to find any written administrative record, setting forth the claim for benefits, the documentary evidence considered (other than the Guidelines), and the reasoning for the denial of benefits. Rather, Defendant has provided its reasoning for its denial of severance payments via Declarations from key employees, with some documentary evidence to support their understanding of the working of the ET & C Program and the reorganization at issue.

The Sixth Circuit has admonished courts from considering such litigation-oriented declarations, reasoning that consideration of such evidence will allow plan administrators to "shore-up" arbitrary or poorly reasoned benefit decisions. It recently stated in *University Hosps. of Cleveland, supra*:

> The dissent sees "no room for doubt" that this construction [of the reason for denial of benefits] was the one adopted by the EBC in denying UHOC's claim. This conclusion is based on the deposition testimony of one EBC member, James Draeger; the EBC's written decision includes no such statement of its reasoning. Our decision in *Wilkins, supra*, 150 F.3d at 618, however, precludes us from considering evidence, such as Draeger's testimony, that is not part of the administrative record.

> Indeed, we should be all the more reluctant to stray from the administrative record where, as here, the proffered evidence is one person's post hoc explanation of an administrative body's decision. In an analogous situation, we do not look to post-enactment statements of legislators when determining the meaning of statutes. *See Michigan United Conservation Clubs v. Lujan*, 949 F.2d 202, 209–10 (6th Cir.1991). More importantly, it strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the

other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review. The concerns inherent in this scenario are even more pronounced where, as here, the administrator has a financial incentive to deny benefits. To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them—or, worse yet, federal judges—to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation. At a minimum, if we permit such rehabilitation of the administrative record, there no longer is any reason why we should not apply a more searching de novo review of the administrator's decision.

Having said this, we do not mean to imply that Mr. Draeger's testimony fails to accurately reflect the basis for the EBC's decision. The point is, we simply cannot tell from the text of the decision itself, nor from the administrative record. Ideally, that text should be the principal point of reference in our review of a challenged denial of benefits.

202 F.3d at 849 n. 7. In light of *Wilkins* and *University Hosps.*, the Court must be mindful not to consider evidence outside of the administrative record, which comprises the same sort of post-hoc evidentiary support against which the Sixth Circuit warns.

With these standards in mind, the Court turns to what is properly deemed part of the administrative record. Clearly, the Guidelines, as the plan document, are proper documentary evidence, which was considered by its decision-makers. As for the background knowledge regarding the reorganization, an analogous situation was addressed in *Mouton v. Mobil Corp. Employee Severance Plan*, 2001 WL 963957 (S.D.Tex. June 18, 2001), in which the plaintiff similarly sought benefits under Mobil Corporation's severance plan. Under the Mobil Severance Plan, an employee was eligible to participate in the retention/severance package if he or she was offered a job within two years of the merger of Exxon Corporation and Mobil Corporation, but declined the job because it involved a cut in total annual pay, which was defined as the employee's annualized base pay plus the target variable pay. The plaintiff moved to strike an affidavit submitted by the defendant, to the extent that it testified to matters which were not part of the administrative record before the plan administrator. The court indicated the declarant testified "from her personal knowledge and experience, and is permitted to give her explanation of the variable pay system Mobil instituted in 1996 as well as Mobil's practices in determining pay and benefits for seconded employees[, such as plaintiff]." *Id.* The court further allowed documents describing the pay system, reasoning that the "documents were background matters of which Mobil employees ... were given notice during Plaintiff's employment with Mobil...." Thus, the court deemed them to be part of the administrative record concerning the plaintiff's benefit request.

Turning to NOVA's statements concerning what comprises the administrative record, the Court considers Defendant's documentary evidence regarding the company's reorganization, as identified by Mr. Boulier, Mr. McLeod, and Mr. Wensky, to be part of the administrative record. Defendant has identified memoranda that Mr. McLeod, Mr. Boulier, and Mr. Wensky received regarding what would occur dur-

ing both Phase 1 and Phase 2 of NOVA's reorganization, and has indicated that they relied on the information therein when evaluating Plaintiff's request for benefits. Moreover, information regarding reorganization's impact on employees and actions by leaders was necessary to determine whether the ET & C Program was triggered. Accordingly, the Court considers this evidence to be part of the administrative record considered by Defendant.

## D. *Appropriate Standard of Review*

■ Under *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), district courts generally apply a *de novo* standard of review in actions challenging an employer's denial of benefits from an ERISA plan. However, when the plan documents grant the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, courts should apply the arbitrary and capricious standard of review. *Id.* at 114–15, 109 S.Ct. 948. The Sixth Circuit has specifically interpreted *Firestone* to require that a plan "expressly give discretionary authority to the administrator." *Perry v. Simplicity Eng'g,* 900 F.2d 963, 965 (6th Cir.1990); *Williams v. International Paper Co.,* 227 F.3d 706, 710 (6th Cir.2000). However, the Sixth Circuit has also recognized that "a finding of such authority does not depend on the plan's use of the word 'discretionary' or any other magic word. *Johnson v. Eaton Corp.,* 970 F.2d 1569, 1571 (6th Cir.1992). Furthermore, discretion is not an all-or-nothing proposition, such that a plan can give an administrator discretion with respect to some decisions but not others. *See Anderson v. Great West Life Assurance Co.,* 942 F.2d 392, 395 (6th Cir.1991)." *Williams,* 227 F.3d at 710.

■ "The arbitrary [and] capricious standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Bartling v. Fruehauf Corp.,* 29 F.3d 1062, 1071 (6th Cir.1994). Where a plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor in determining whether there is an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948 (citing Restatement (Second) Of Trusts § 187 cmt. d (1959)). However, the existence of a conflict of interest does not require a court to abandon the arbitrary and capricious standard of review. See *Borda v. Hardy, Lewis, Pollard & Page, P.C.,* 138 F.3d 1062, 1069 (6th Cir. 1998). In such cases, the application of the arbitrary and capricious standard "should be shaped by the circumstances of the inherent conflict of interest." *See Miller,* 925 F.2d at 984 (citing *Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1563 (11th Cir.1990)).

■ Upon review of the Guidelines, NOVA has reserved the right to modify or terminate any particular program, policy or benefit at any time, without prior notice. (Guidelines at 1). With regard to eligibility requirements, the Guidelines provide: "As we have said, ET & C is not an across-the-board downsizing vehicle. The Company in its discretion determines which business units are eligible and any specific limitations or modifications to the ET & C Program applicable to that business unit." (*Id.* at 8). In the section entitled "Leader communication," the Guidelines further state:

One of the first tasks of any leader in a group undergoing restructuring is to identify which business unit(s) are facing

reductions. The Company has the discretion to establish these parameters, and in particular to limit those eligible to submit proposals for voluntary separation under the options offered and to determine those designated as key contributors. Everyone in the work group must know:

- The affected unit(s).
- The actual number of positions to be eliminated.
- Who is eligible to participate in ET & C.
- What new jobs have been created as a result of restructuring and what skills are required.·
- What criteria will be used to resolve under or oversubscription for voluntary separation
- The windows for the various stages of the process.

(Guidelines at 11). Based on this language, NOVA has given itself the discretion to determine eligibility for ET & C Program benefits, which initially suggests that the arbitrary and capricious standard is the appropriate standard for review herein.

Despite the language in the Guidelines granting discretion, the Court concludes that *de novo* review is the appropriate standard. Upon review of the evidence submitted by the parties, the Court notes that Defendant has failed to provide a written denial of severance benefits. The sole sources of the explanations for the denial of benefits appears in the Declarations submitted by Defendant. However, as stated in *University Hosps. of Cleveland,* these post hoc, litigation-oriented averments cannot be considered. Thus,

the administrative record—such as it is—contains no evidence of the actual decision and its reasoning. The Court, therefore, has no contemporaneous evidence of NOVA's explanation for the denial of severance payments, created at the time the denial was made. Consequently, although it is undisputed that the severance payments were denied, there is no basis for the decision for the Court to review.[2]

Although not raised by the parties, NOVA's failure to provide written notification of its denial of benefits under the ET & C Program implicates the requirements of 29 U.S.C. § 1133. That section provides:

> In accordance with regulations of the Secretary, every employee benefit plan shall—
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133; *see also* 29 C.F.R. § 2560.503–1 (regulation implementing § 1133). "In cases in which the procedure used to notify a beneficiary of a denial of benefits is technically deficient, the Sixth Circuit has adopted a rule that substantial compliance with ERISA's procedural requirements is sufficient if the procedures used meet the purposes of § 1133." *Thompson v. J.C. Penney Co., Inc.,* 2001 WL 1301751 (6th Cir.2001), citing *Kent v. United of Omaha Life Ins. Co.,* 96 F.3d

---

**2.** In his memorandum in opposition to Defendant's motion for summary judgment, Plaintiff notes that Defendant's explanation for denying severance payments has evolved over time from (1) "no," to (2) "you left prior to December 31, 1996," to (3) "the ET & C Program was not triggered in April of 1996" (Doc. # 13 at 6).

803, 807 (6th Cir.1996). Procedures satisfy the purposes of § 1133 if they give the employee an understanding of the reasons for denial and of his right to appeal the decision. *Id.* In other words, procedural notice is inadequate if "it fails to provide the specific reason or reasons for denial and the specific reference to pertinent plan provisions on which the denial is based" (or provides mere conclusions) and "explicit information as to the steps to be taken if the employee wishes to submit his claim for review." *VanderKlok v. Provident Life & Accident Ins. Co.*, 956 F.2d 610, 616 (6th Cir.1992).

Herein, NOVA did not provide any written denial of severance payments. In fact, numerous NOVA employees expressly stated that the company would provide only written notice of eligibility, and would not provide written notice of ineligibility. Even if the Court were to accept Defendant's evidence that Plaintiff was told that he was not eligible for ET & C Program benefits and severance, because he was leaving NOVA prior to December 31, 1996 (e.g., Wensky Decl. ¶ 21),[3] there is no evidence that Plaintiff was referred to any section of the Guidelines, or was provided information about how to appeal that determination. Accordingly, the Court concludes that NOVA's denial of severance payments did not comply, or substantially comply, with § 1133. *See Thompson*, 2001 WL 1301751 (telephone call denying benefits did not substantially comply with § 1133, because the administrator's statement that plaintiff was not a participant in

the plan did not given sufficient reasons for the denial, and there was no information about his right to appeal).

In *Thompson, supra*, the Sixth Circuit addressed the appropriate standard of review when the plan administrator has failed to offer the plaintiff an explanation of the denial of his claim, including an interpretation of the plan, in violation of § 1133. The court of appeals rejected the application of the arbitrary and capricious standard, reasoning:

> If in fact a plan administrator never offers an interpretation of plan language, then there is nothing to which the court can defer. Although the [plan] document clearly grants discretionary authority to defendants, defendants never provided an interpretation of the Plan to plaintiff in response to his claim that he continued to be enrolled in the Plan. As a result, we cannot apply a deferential standard of review.

*Id.* at *4. Like the company in *Thompson*, NOVA has failed to provide Plaintiff a written denial of severance payment, explaining his ineligibility under the terms of the ET & C Program. Because they failed to interpret the Guidelines in denying Plaintiff's claim, the arbitrary and capricious standard is inappropriate herein. Accordingly, the Court will conduct a *de novo* review of NOVA's denial of severance benefits.[4]

E. *Plaintiff's Entitlement to Severance*

 Having established that the ET & C Program is an ERISA plan, the evi-

---

**3.** Mr. Boulier states in his Declaration that he informed Plaintiff that he was not eligible for ET & C Program benefits and severance (Boulier Decl. ¶ 10). However, he does not indicate that he gave Plaintiff any explanation for his ineligibility.

**4.** In the present case, the administration of the ET & C Program is handled by NOVA. Because the ET & C Program is funded by NOVA's general funds, there is a potential for

a conflict of interest between payment of plan benefits and company profits. *See Callahan v. Rouge Steel Co.*, 941 F.2d 456 (6th Cir. 1991). However, due to Defendant's failure to comply with § 1133, the Court need not apply the arbitrary and capricious standard. Likewise, the Court need not determine what impact the potential conflict of interest should have on this standard.

dence which may be considered, and that the Court should employ a *de novo* standard of review, the remaining issue before the Court is whether NOVA properly concluded, given the language of the plan, that Plaintiff was not entitled to severance under the ET & C Program.

The Directions section of the Guidelines discuss the overall goals and general procedures of the ET & C Program. In the sub-section entitled "The Importance of Choices," the Guidelines indicate that the ET & C Program was designed to create options as a result of corporate downsizing: "ET & C is designed to accomplish necessary *workforce reductions* by offering people an opportunity to make choices about their future and supporting their choices with meaningful career transition programs." (Guidelines at 5)(emphasis added). Other sections further demonstrate that ET & C Program benefits were designed to apply during workforce reductions. Discussing how ET & C works, the Guidelines state: "When a department or work team restructures, not everyone is likely to be affected by reduction targets. During the individual process rollout, leaders should communicate which groups face cuts and which positions have been lost." (Id. at 6). Despite the strong emphasis on assisting employees who jobs are lost, the Guidelines do recognize, in a single sentence, that an employee whose job has been altered may qualify for ET & C Program benefits. (*Id.* at 7)("ET & C is designed to assist employees whose jobs are lost or altered as a result of restructuring.").

Most notably, as discussed, *supra,* the Guidelines set forth the eligibility requirements for obtaining benefits under the ET & C Program. It states:

You are eligible to participate in the process if you are a regular, non-union NOVA employee in US, and offshore locations (full-time or part-time) and you belong to a business unit targeted for reductions. If you are a temporary employee who has been on the company's payroll for more than two years you are also eligible.

(Guidelines at 8). The Guidelines grant NOVA the discretion to determine "which business units are eligible and any specific limitations or modifications to the ET & C Program applicable to that business unit." (*Id.* at 8). In the section entitled "Leader communication," the Guidelines further state: "The Company has the discretion to establish these parameters, and in particular to limit those eligible to submit proposals for voluntary separation under the options offered and to determine those designated as key contributors." (Guidelines at 11).

Plaintiff has asserted that he became eligible on April 15, 1996, when he was informed that, as a result of Phase 1 of the reorganization, he was removed from his leadership position. Specifically, prior to that date, the Technology Leadership Team consisted of nine individuals. Effective April 15, 1996, two leadership positions were eliminated. Plaintiff was assigned to "Special Projects."

Although the uncontroverted evidence indicates that Plaintiff lost leadership responsibilities, the evidence does not support Plaintiff's contention that Phase 1 triggered the ET & C Program. Under the Guidelines, the leader of a group undergoing restructuring must identify which business units are facing reductions to trigger eligibility (Guidelines at 11). Although job positions were reassigned in Plaintiff's group, there is no evidence in the record that Plaintiff's business unit was targeted for reductions as a result of Phase 1. This decision appears reasonable, in light of the fact that no employee positions were eliminated, and it is undisputed

that Plaintiff's salary and Haypoints remained unchanged. Accordingly, under the clear language of the Guidelines, NOVA reasonably determined that Plaintiff's group was not a "business unit targeted for reductions" as a result of Phase 1 of the reorganization. Absent that determination, Plaintiff was not eligible for ET & C Program benefits and severance, beginning on April 15, 1996.

It is undisputed that on May 29, 1996, NOVA announced the closing of the Leominster facilities and the relocation of Technology and other operations to other sites, and that such an action triggered the ET & C Program for Leominster employees. It is further undisputed that NOVA established conditions on the eligibility for ET & C Program benefits, as is within their discretion, according to the Guidelines. One such condition was an employee's satisfactory work performance through the employee's termination date. Although Plaintiff was not eligible for ET & C Program benefits as a result of Phase 1, the uncontroverted evidence indicates that he became eligible upon the announcement of the Leominster closure. However, it is also undisputed that Plaintiff left his employment prior to his termination date, which Defendant had indicated would be no earlier than December 31, 1996. Accordingly, even applying a *de novo* review of NOVA's denial of benefits, the Court concludes that Plaintiff was not eligible under the terms of the ET & C Program as a result of Phase 1, and that he did not comply with Defendant's conditions, when he subsequently became eligible. Accordingly, the Court concludes that Defendant did not improperly deny benefits to Plaintiff.

For the foregoing reasons, Plaintiff's Motion for Determination (Doc. # 20) is SUSTAINED. The Court makes the following conclusions: (1) that the Severance policy is a component of the ET & C Program; (2) that the ET & C Program is an "employee welfare benefit plan," within the meaning of ERISA; (3) that the Court will employ a *de novo* standard of review, due to Defendant's failure to provide sufficient written notice of its denial of Plaintiff's claim, in violation of § 1133, and its failure to provide its interpretation of the plan documents therein; (4) that the Court may consider the Guidelines, as well as documents providing background information about the reorganization, of which all relevant NOVA employees had notice; and (5) that applying the *de novo* standard of review, Defendant did not improperly deny Plaintiff severance benefits.

Based upon the foregoing, the Court directs that judgment be entered in favor of the Defendant and against the Plaintiff, dismissing this case with prejudice.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.